IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| SHARON F. CLARK, <br> 10165 Log Cabin Road <br> Denton, MD 21629, <br> <br> *Plaintiff,* <br> <br> v. <br> <br> NCI INFORMATION SYSTEMS, INC. <br> 11730 Plaza America Drive <br> Reston, VA 20190, <br> <br> *Defendant.* | * <br> <br> * <br> <br> * <br> <br> * <br> <br> Civil Action No. _____ <br> * <br> <br> * <br> <br> * |

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

### **I. INTRODUCTION**

Sharon F. Clark, Plaintiff, by John B. Stolarz, her attorney, files this Complaint against NCI Information Systems, Inc. ("NCI") for Retaliation in violation of the False Claim Act, 31 U.S.C. § 3730(h).

### **II. JURISDICTION AND VENUE**

1. This Court has jurisdiction of this action by reason of 28 U.S.C. § 1331, and pursuant to 31 U.S.C. § 3730 (h).

2. Venue is proper in this Court pursuant to 31 U.S.C. § 3730(h) because the Defendant transacts business in this judicial district.

3. Defendant is subject to personal jurisdiction of this Court pursuant to Md.Ann.Code,

1

Courts & Judicial Proceedings Article § 6-103(b)(1).

### III. PARTIES

4. Plaintiff Sharon F. Clark resides at 10165 Log Cabin Road, Denton, MD 21629. Throughout her employment at NCI, the Plaintiff worked out of her office at her residence.

5. Defendant NCI is a Virginia corporation which, at all times relevant herein, maintained a Maryland office at 10165 Log Cabin Road, Denton, MD 21629.  Further, Defendant transacts business in Maryland.

### IV. FACTS

6.  The Plaintiff began working for NCI as a Medical Review Project Manager in approximately 2015.

7. In early 2018 Defendant NCI named the Plaintiff as the Medical Review Manager ("MRM") on Defendant's Payment Error Rate Measurement contract ("PERM") with the Centers for Medicare & Medicaid Services ("CMS"), a federal agency of the United States Department of Health and Human Services.

#### PERM CONTRACT PROCEDURES.

8. CMS created PERM program to comply with the Improper Payments Information Act that requires federal agencies to identify programs that may be susceptible to significant improper payments, estimate the amount of improper payments, submit those estimates to Congress, and report on the actions the agency is taking to reduce improper payments.

9.  The PERM contract, awarded to NCI, was intended to measure improper payments

for medical care in Medicaid and Children's Health Insurance Program (CHIP) and produces error rates for each program. The error rates are based on reviews of the fee-for-service, managed care, and eligibility components of Medicaid and CHIP.

10.  NCI's work under the PERM contract was as follows: Lewin Group, a contractor hired by CMS, would obtain and forward to NCI a selected sample, from every State, of payments made by Medicaid to healthcare providers rendering medical care to individuals covered by Medicaid.  The information sent by the Lewin Group is sometimes referred to herein as "Paid Claims," or "Claims."

11. The Paid Claims sample sent by the Lewin Group to NCI contained the name of the healthcare provider, the date of medical service, the ICD Codes (the ICD code identifies a diagnosis and describes a disease or medical condition), the CPT codes (the code used to describe the condition or disease being treated, also known as the diagnosis), the identity of the Medicaid patient, and the amount paid by Medicaid to the healthcare provider.

12. After receiving the Paid Claims sample from the Lewin Group, NCI's Medical Records Department (also referred to herein as the "Records Department") sent letters to the healthcare providers requesting, within 45 days, supporting documentation for the medical services provided by the healthcare provider to the individual covered by Medicaid. This supporting documentation is sometime referred to herein as "Backup Documentation."

13. After receipt of Backup Documentation from the healthcare providers the documents received were required, by the PERM contract, to be reviewed for correctness and completeness by NCI's First Touch Team.  The First Touch Team was a Quality Assurance ("QA") step to be conducted by a group of nurses hired for that purpose.

14.  After review by the First Touch Team, the Medical Records Department would

transmit the Backup Documentation, to the Medical Review Department (also referred to herein as the "Review Department").

15.  The Medical Review Department, of which the Plaintiff was Manager, would review the Backup Documentation to determine whether the amount paid to the healthcare provider for each medical service was correct.  If the Paid Claim was correct the Review Department approved the claim. .If the medical service was billed incorrectly the Review Department would code it as such and the State would need to work on getting that portion repaid to Medicaid.

16. CMS held monthly Touchpoint meetings with the States, and certain NCI personnel A CMS representative,  assigned to that State, also attended. The discussion included issues raised by the State, the review process, any applicable State policies, and onsite visits to the State Medicaid offices.

## NCI'S VIOLATIONS OF THE PERM CONTRACT.

17.  The primary problem encountered by the Medical Review Department was that the Backup Documentation for Paid Claims, received by the Records Department from the healthcare providers, was often incomplete. Other times the healthcare provider's response advised the Records Department that the date of service was incorrect, or that the healthcare provider did not provide the medical treatment set forth in the claim. The inaccurate or incomplete documentation is sometimes referred to herein as "Deficient Documentation."

18.  It became evident to the Plaintiff that the Deficient Documentation problem arose because the First Touch Team failed to ensure that the Backup Documentation was accurate and complete before it was transmitted to the Review Department.

19. The result was that NCI's Records Department did not follow up on the Deficient Backup Documentation to obtain the correct and complete supporting medical documentation from the correct healthcare provider.

20. Instead, the Records Department forwarded the Deficient Documentation for the Paid Claims to the Medical Review Department.

21. The Review Department was unable to complete its review of Payment Information which had incorrect or Deficient Documentation. The Claims which the Review Department was unable to review because of Deficient Documentation are sometimes referred herein as "Unresolved Claims."

22. A complicating factor for the Review Department was that NCI's software program did not allow the Review Department to send the Unresolved Claims back to the Records Department to obtain the correct information and/or Backup Documentation.

23. The reason for this is that NCI chose not to build the PERM 360 computer system as required by NCI's contract bid. Instead, Defendant chose to use the less expensive Statistical Modeling and Estimation of Software Reliability Functions software program ("SMERF") to process the work under the contract. The SMERF software was limited due to its inability to interface with other applications in use by NCI on the PERM contract. Plaintiff became aware of this incompatibility when she reviewed NCI's bid to obtain the PERM. Plaintiff concluded that this was a violation of NCI's contract with CMS.

24. This inability to send the unresolved Claims back to the Records Department for follow up caused a large backlog in the Review Department work queue that was not resolved while the Plaintiff was employed by the Defendant.

5

**PLAINTIFF'S EFFORTS TO HAVE NCI
COMPLY WITH ITS CONTRACT WITH CMS**.

25. After the Plaintiff began working on the PERM contract every two months the Plaintiff and entire PERM management team met with Mary Kay Kohuts, who is NCI's Quality Assurance Director and, Program Director Carlis Faler, and Chad Landtroop, Plaintiff's supervisor, to discuss the benchmarks established by NCI for reviewing the Claims received from Lewin. During these meetings Plaintiff repeatedly reported that the inability to return the Unresolved Claims to the Records Department for followup created a large backlog of Unresolved Claims in the Review Department.

26. From July 2019 to March 30, 2019 Plaintiff attended weekly meetings with Chad E. Landtroop, Plaintiff's supervisor, to discuss the work of the Review Department. Plaintiff also submitted weekly reports to Mr. Landtroop with the status of the claims received by the Review Department. During the meetings, and in the reports, Plaintiff repeatedly advised her NCI supervisors that:

A. The Review Department could not review Claims sent over by the Records Department with incorrect or Deficient Documentation;

B. The software program would not allow the Review Department to return the Unresolved Claims to the Records Department for follow up.

B. The software deficiency caused a large back log of Unresolved Claims in the Review Department.

27. The Deputy Director was frequently notified of this software problem. The answer that the Plaintiff received was that this was not a priority and that it would be addressed at another time.

28. Defendant NCI withheld the true extent of the problems it was experiencing with the SMERF software system from CMS for fear of corrective action from CMS.

6

29. Rather than admitting to CMS that the processing of Claims was actually held up in Review Department queues, Defendant NCI lied to CMS advising them that the Claims were never received. The individual States were also told falsely that NCI had not received the Paid Claims information requiring the States to resubmit the same information.

30. The States that submitted the data samples were also not made aware of the back log.

31. The following are examples of some of Plaintiff's efforts to remedy the PERM contract violations by NCI:

   A. On April 12, 2019 Plaintiff sent an email to Laurie Hobby, in NCI's Information Technology ("IT") Department, concerned about the inability to move Unresolved Claims back to the Records Department for follow up. Plaintiff's intent in sending this email was for the purpose of having NCI take corrective action to remedy the violation of its contract with CMS.

   B. On April 30, 2019 Plaintiff met with John Louallen to discuss aging claims and the Review Department's inability to move non-processable Unresolved Claims back to the Records Department for follow up. Plaintiff's meeting was for the purpose of having NCI take corrective action to remedy the violation of its contract with CMS.

   C. On June 6, 2019 Plaintiff met with John Louallen and, again, reported that the Unresolved Claims were sitting in the Review Department work queue because of the inability to return them back to the Records Department for follow up. Plaintiff further told Mr. Louallen that because of deficient documentation and the inability to send the claims back to Records for followup, the claims remained untimely and needed to be processed. Plaintiff's meeting was for the purpose of having NCI take corrective action to remedy the violation of its contract with CMS.

   D. On June 10, 2019 Plaintiff sent Mr. Louallen an email about the continuing problem the Review Department had with SMERF because the backlog of Unresolved Claims was in the hundreds. Plaintiff suggested that the software be modified to enable the Review Department to send the Unresolved Claims back to the Records Department for follow up. Plaintiff's email was for the purpose of having NCI take corrective action to remedy the violation of its contract with CMS. Mr. Louallen was not willing to modify the software to give the Review Department the ability to do so.

   E. On June 12, 2019 Plaintiff met with John Louallen and Dorothy Foster to discuss the backlog of Unresolved Claims in Review Department work queues. Plaintiff was concerned that the claims coming to the Review Department were not reviewed by the First Touch Team to ensure that they were correct and complete. Plaintiff's meeting was for the purpose of having NCI take corrective action to remedy the

    violation of its contract with CMS.

F. On June 17, 2019 Plaintiff held a meeting with John Louallen and Dorothy Foster to report continuing concerns regarding the Medical Record Department sending over Claims with Deficient Documentation to the Review Department, thereby creating a backlog of non-processable claims. Plaintiff's meeting was for the purpose of having NCI take corrective action to remedy the violation of its contract with CMS.

G. On June 18, 2019 Plaintiff set up a meeting with Mr. Louallen to discuss California's issues with their claims. The State of California had been requesting a decision on the claims that had been sent in for evaluation by NCI, but the Review Department was unable to evaluate and approve the claims because Backup Documentation that was sent to NCI was either misplaced or lost by Records Department. Plaintiff's meeting was for the purpose of having NCI take corrective action to remedy the violation of its contract with CMS.

H. On June 26, 2019 Plaintiff met with Dorothy Foster, the Records Department Manager, and the Records team regarding problems with the First Touch Team process because the Paid Claims that were being sent over to the Review Department had Deficient Documentation. Plaintiff advised Ms. Foster that this was again impacting the ability to process the claims accurately or timely by the Review Department. Plaintiff's meeting was for the purpose of having NCI take corrective action to remedy the violation of its contract with CMS. Ms. Foster denied that the backup documentation sent to the Review Department was deficient. Plaintiff's meeting was for the purpose of having NCI take corrective action to remedy the violation of its contract with CMS.

I. On July 12, 2019 Plaintiff met with Chad Landtroop, John Louallen, Laurie Hobby, who was the Applications Lead and Nital Patel, who was the Senior Applications staff member assigned to PERM, to address the Review Department's inability to move Unresolved Claims back to the Records Department. Plaintiff's meeting was for the purpose of having NCI take corrective action to remedy the violation of its contract with CMS. Although Plaintiff was assured that they would prioritize the Review Department's issues, nothing was ever actually done.

J. On July 19, 2019 Plaintiff met with Chad Landtroop and discussed the backlogged claims due to the communication problems with the SMERF software and the inability of the Review Department to send Unresolved Claims back to the Records Department for follow up. Plaintiff sought access to the software codes needed to enable the Review Department to send the Uresolved Claims to the Records Department for followup. Plaintiff was advised that The IT Department was the only staff that could move these claims where they needed to go, but they had other priorities. Plaintiff's meeting was for the purpose of having NCI take corrective action to remedy the violation of its contract with CMS.

K. On July 25, 2019 Plaintiff attended a PERM meeting with Mary Kay Kohut, who was the QA Director, and the PERM management. Ms. Kohut asked about the backlog of Claims in the Review Department. Plaintiff told her that the backlog of Claims was caused by Deficient Documentation received from the Records Department, but which Plaintiff was unable to send back for follow up by the Records Department. Chad Landtroop told the group that he would prioritize a modification with the Information Technology Department. Plaintiff's meeting was for the purpose of having NCI take corrective action to remedy the violation of its contract with CMS. However, that did not occur while the Plaintiff was employed by NCI.

L. On August 1, 2019 Plaintiff met with Chad Landtroop, Nital Patel and Laurie Hobby about the backlog of Unresolved Claims and about the inability to utilize certain software codes which would permit he Review Department to send the Unresolved Claims back to the Records Department for follow up. Plaintiff's meeting was for the purpose of having NCI take corrective action to remedy the violation of its contract with CMS.

M. On August 8, 2019 Plaintiff met with John Louallen, Kerri Hillis, Dorothy Foster regarding California's concerns about the Claims submitted by that State. Those concerns were NCI's denial of receipt of Claims submitted by California. NCI staff had not been permitted to share with California that in fact they had received medical documentation on many of their claims. Mr. Louallen stated that we would work with them ( California) to have their documents resent

N. On August 23, 2019 the Plaintiff met with Chad Landtroop to go over the Review Department about the backlog of Unresolved Claims due to other IT priorities. Plaintiff discovered that the Records Department manager told her team to pass the Claims with Deficient Documentation to the Review Department without review by the First Touch Team because that step had not been implemented by the Records Department. Plaintiff's meeting was for the purpose of having NCI take corrective action to remedy the violation of its contract with CMS.

O. On September 3, 2019 Plaintiff met with Chad Landtroop to discuss work that was lost on August 28, 2019 and August 29, 2019 because the electronic faxes were not functioning. All of the medical documentation previously received from healthcare providers was lost. NCI's Records Department was required to obtain new document backup from the healthcare providers. The Medical Record Manager said she was not aware of the system disruption. Chad Landtroop directed everyone not to mention this in State Meetings or to CMS until he chose to advise them of the delay.

P. As of September 17, 2019 there were still 350 Unresolved Claims in the Review Department's work queue that had Deficient Documentation, but could not be returned to the Records Department for followup.

- Q. On October 2, 2019- Plaintiff met with her Review management team to discuss the Unresolved Claims because of Deficient Backup and the inability to send them back to the Records Department for follow up.  Those issues were addressed so they could be aware of the status as these issues had been ongoing for months with no resolution.

- R. On October 2, 2019 Plaintiff met with other members of the PERM management team and CMS to discuss the deficient processing of the claims; lack of updates on the PERM systems and loss of SMERF access for 2 days. Plaintiff, and other NCI employees were instructed not to share the backup problems with CMS.

- S. On November 8, 2019 Plaintiff, again, spoke with Chad Landtroop to do something about the inability to return Claims with Deficient Back up to the Records Department because backlog of Unresolved Claims was increasing. Plaintiff's meeting was for the purpose of having NCI take corrective action to remedy the violation of its contract with CMS.   Mr. Landtroop said he had it on his list to be addressed. Plaintiff's conversation was for the purpose of having NCI take corrective action to remedy the violation of its contract with CMS

- T. About a week before March 30, 2020, during a weekly meeting, Plaintiff again complained once again about the backlog of Unresolved Claims caused by the software incompatibility.  Plaintiff's meeting was for the purpose of having NCI take corrective action to remedy the violation of its contract with CMS.

32. Throughout this time Mr. Louallen and Mr. Landtroop instructed the Plaintiff not to share information about the large backup of Unresolved Claims with CMS.

33. NCI's actions constituted a concerted effort to keep CMS in the dark about NCI's failure to meet deadlines mandated by the PERM contract.

34.  On March 30, 2020, the Plaintiff was scheduled for a telephone conference with Mr. Landtroop to discuss individual Claims that were being looked at for accuracy by CMS.  This is a process step that CMS conducts with each contractor.

35. Instead of discussing the stated issues, Mr. Landtroop directed the Plaintiff to look at an email from Clay H. Worley, NCI's Chief Human Resources Officer, terminaing Plaintiff's employment.  Plaintiff was advised that the termination was requested by CMS.

36. Defendant's stated reason that CMS requested that Plaintiff be removed from the PERM contract was false because, up to this time, neither NCI nor CMS raised any issues with Plaintiff's performance on the PERM contract.

37. Defendant's stated reason for terminating Plaintiff's employment was a pretext because on her March 9, 2020 Performance Evaluation, Chad E. Landtroop, Plaintiff's supervisor, rated Plaintiff's performance as "Successful" for the period ended December 31, 2019.  Mr. Landtroop's comment on the Performance Evaluation was:

> "Sharon is a valuable member of the PERM team. She has taken to the [Review] manager role with great vigor. PERM processes require a substantial learning curve and Sharon has taken to each challenge would vigor. She is a team player and a pleasure to have on the PERM RC team.  I look forward to many additional years of success on the PERM with Sharon."

38. Plaintiff's termination was in direct retaliation for bringing to Defendant's attention the numerous violations of the PERM contract.

## IV.  COUNT ONE.

### Retaliation in Violation of False Claim Act, 31 U.s.c. § 3730(h).

39.  The foregoing paragraphs are incorporated in this Count.

40. Section 3729(a)(1)(A) of the FCA prohibits any person from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Section 3729(a)(1)(B) of the FCA prohibits any person from "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

11

41. As the foregoing shows, the Plaintiff made numerous attempts to have NCI correct the breaches of the PERM contract with CMS.

42.  Upon information and belief, Defendant NCI billed CMS for work that was not done or incomplete. Defendant's false billings for incomplete work, or work not done, under the contract constituted a violation of 31 U.S.C. § 3729.

43. Plaintiff's attempts to correct the deficiencies in the claim review process was based upon Plaintiff's belief that NCI was violating, or soon would be violating the False Claims Act.

44.  Plaintiff's attempts to have NCI correct the deficiencies was a protected activity designed to stop the violation , or a potential violation, of NCI's contract with CMS, a violation of the False Claims Act.

45. Defendant clearly knew about Plaintiff's protected activity and terminated the Plaintiff on account of her protected activity.

46. NCI had a duty under the False Claims Act, 31 U.S.C.§ 3730(h) to refrain from taking retaliatory actions against employees who take lawful actions under the False Claims Act or other efforts to stop contract violations and/or false billings, prohibited by the False Claims Act.

47.  As a result of the retaliatory termination, the Plaintiff suffered a loss of wages and benefits resulting in a significant financial strain on the Plaintiff. As a further result of the termination, Plaintiff suffered severe emotional distress, humiliation, embarrassment and harm to Plaintiff's reputation.

## V. PRAYER FOR RELIEF.

Wherefore Plaintiff respectfully requests that she be awarded the following relief:

A. Back pay for lost wages and employment benefits, estimated at $ 75,000.00;

B. Other expenses incurred by the Plaintiff;

C. Compensatory damages, including, but not limited to, emotional distress, humiliation, embarrassment, and damage to reputation in the amount of $ 500,000.00;

D. Punitive damages in the amount of $ 1,000,000.00;

E. Attorney fees, expert fees and other litigation expenses; and

F. And for such other and further relief, as may be appropriate under the circumstances.

/s/ John B. Stolarz
John B. Stolarz
U.S.D.C. No.: 01929
The Stolarz Law Firm
6509 York Road
Baltimore, MD 21212
(410) 532-7200
(410) 372-0529 (fax)
stolarz@verizon.net

Attorney for Plaintiff

## DEMAND FOR JURY TRIAL

Sharon F. Clark, Plaintiff, by John B. Stolarz, her attorney, demands a jury trial on all issues.

/s/ John B. Stolarz
John B. Stolarz

Attorney for Plaintiff

W:\5373\Pleadings\Complaint and Demand For Jury Trial.wpd